# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JOHN MARTIN, RHONDA BREWER,
DAVID MCCOY, MARY O'GRADY,
and MARISSA ELYSE SANCHEZ,**

        Plaintiffs,

v.                                      **No. CIV 18-0031 RB/JFR**

**CITY OF ALBUQUERQUE,**

        Defendant.

## MEMORANDUM OPINION AND ORDER

This case involves a First Amendment issue that continues to confront courts across the country—whether a municipal ordinance restricting pedestrian activities violates the free speech rights of those pedestrians, particularly panhandlers. The City of Albuquerque has justified the restrictions in its "pedestrian safety" ordinance (the Ordinance) with roadway design principals that suggest pedestrians were never meant to occupy certain areas. Though terms like "solicitation" and "panhandling" never appear in its text, many Albuquerque citizens—including some of the City Councilors who approved it—view the Ordinance as a measure to reduce panhandling. The relevant legal issues are nuanced and numerous, but the underlying question for the Court is relatively straightforward. Are common-sense and anecdotal safety concerns about the risk of standing near moving traffic sufficient to justify restricting access to areas where pedestrians often engage in panhandling, charitable giving, and political speech?

The Court heard argument on this matter during a motions hearing on June 18, 2019. (*See* Doc. 128.) Being fully advised of the record and relevant law, the Court concludes that, with the exception of the prohibition on standing in travel lanes, the Ordinance is an unconstitutional restriction on free speech because it is not narrowly tailored to meet the City's interest in reducing pedestrian-vehicle conflicts.

# I.    Background[1]

In November 2017, the City adopted Council Bill O-17-51, now codified at Albuquerque Code of Ordinances § 8-2-7-2. (Doc. 1 (Compl.) ¶ 1.) The Ordinance, sponsored by City Councilor Trudy Jones, amends the section of the Albuquerque Traffic Code regarding pedestrians to prohibit "occupying roadways, certain medians and roadside areas . . . [and] certain pedestrian interactions with vehicles." Albuquerque, N.M., Code § 8-2-7-2. (*See also* Doc. 90-29 at 3, 6.) On July 10, 2019, the City enacted Council Bill O-19-66, which amended the Ordinance.[2] (*See* Doc. 133 at 1.) The preamble to the original bill includes numerous "whereas clauses" painting a picture of the grave state of pedestrian safety in Albuquerque. (Doc. 90-29 at 3–5.) It references statistics from the National Highway Traffic Safety Administration (NHTSA) that show "New Mexico had the highest rate of pedestrian fatalities per 100,000 population in 2014 and the seventh highest in 2015, and Albuquerque had the second highest pedestrian fatality rate per 100,000 population amongst cities with a population of over 500,000 in 2014 . . . ." (*Id.* at 3.)

A complete understanding of the Ordinance requires a close examination of its five operative subsections. Subsection (A) makes it "unlawful for any person to stand in any travel lane of a street, highway, or controlled access roadway or in any travel lane of the exit or entrance ramps thereto . . . ." § 8-2-7-2(A). "Travel lane" is defined as "the portion of the roadway dedicated to the movement of motor vehicles traveling from one destination to another where a motor vehicle

---

[1] In accordance with summary judgment standards, the Court recites all admissible facts in a light most favorable to the party opposing summary judgment. Fed. R. Civ. P. 56; *see also Simon v. Taylor*, 252 F. Supp. 3d 1196, 1229 (D.N.M. 2017) ("[t]he court handles cross-motions as if they were . . . distinct, independent motions . . . [and] in evaluating each motion, the court must consider the facts and inferences in the light most favorable to the non-moving party") (quotation omitted). The Court recites only that portion of the factual and procedural history relevant to these motions.

[2] The Court's references to "the Ordinance" herein thus refer to the Ordinance as modified by Council Bill O-19-66.

may not remain stationary indefinitely without eventually obstructing the free flow of traffic, and not including shoulders, bicycle lanes, or on-street parking." § 8-1-1-2.

Subsection (B) makes it "unlawful for any person to access, use, occupy, congregate or assemble within six feet of a travel lane of an entrance or exit ramp to Interstate 25, Interstate 40, or to Paseo del Norte at Coors Boulevard NW, Second Street NW, Jefferson Street NW, or Interstate 25, except on a grade separated sidewalk or designated pedestrian way . . . ." § 8-2-7-2(B).

Subsection (C) prohibits the same activities "within any median not suitable for pedestrian use . . . ." § 8-2-7-2(C). A median that is "not suitable for pedestrian use" is defined as:

(1) Any portion of a median that is less than six feet in width, and located within a roadway with a posted speed limit of 30 miles per hour or faster or located within 25 feet of an intersection with such a roadway; or
(2) Is the landscaped area of the median as defined by this Traffic Code; or
(3) Is otherwise identified by signage as not suitable for pedestrian use by the City Traffic Engineer based on identifiable safety standards, including but not limited to an unsuitable gradient or other objectively unsuitable features.

§ 8-2-7-2(C)(1)–(3).

Under Subsection (D), it is "unlawful for any pedestrian to engage in any physical interaction or exchange with the driver or occupants of any vehicle within a travel lane . . . ." § 8-2-7-2(D). Subsection (E) prohibits the same "physical interaction or exchange" with a pedestrian by "any occupant of a motor vehicle within any travel lane or intersection . . . ." § 8-2-7-2(E).[3]

Plaintiffs are Albuquerque residents who engage in activities including panhandling, donating, and political advocacy in areas where they allege such activity would be prohibited by

_____

[3] Subsection (F) qualifies that "[n]othing herein shall be construed as preventing . . . physical interactions or exchanges between pedestrians and occupants of vehicles where the vehicle is lawfully stopped or pulled over outside of a travel lane, or parked at a location where on-street parking is permitted." § 8-2-7-2(F). Subsection (F) does not impose any new restrictions; it simply points out that physical exchanges between pedestrians and motorists are not unlawful when the vehicle is not in a travel lane. Thus, the Court refers only to Subsections (D) and (E) as the "physical exchange ban" throughout this Opinion.

the Ordinance. (*See* Compl. ¶¶ 33–38.) Rhonda Brewer has been homeless since 2015, and one to three times per week, "to make ends meet[,]" she solicits donations from motorists at stoplights while she is standing on street medians or near freeway entrances (Docs. 90-10 ¶¶ 5–7; 90-9 at 7:21–9:8, 14:5–10.) Ms. Brewer typically solicits money, food, clothing, and other items by holding a sign that says, "Work is slow, anything will help" or something similar. (Doc. 90-10 ¶ 7.)

Mary O'Grady donates food, water, and hygiene products to individuals soliciting donations "on a daily basis, often more than once per day." (Doc. 90-14 ¶¶ 5, 8.) Ms. O'Grady typically makes these donations from her car, while stopped at a red light, to individuals "who are standing on medians or at stop lights along the side of the road next to highway entrance or exit ramps." (*Id.* ¶¶ 6, 9.) David McCoy is an Army veteran who donates money, water bottles, food, and other items to panhandlers approximately three to four times per week (Doc. 90-6 ¶¶ 2, 5), usually "by handing the[se] items from the window of [his] vehicle while stopped at a red light (*id.* ¶ 6).

Finally, Marissa Elyse Sanchez participates in political demonstrations and engages in issue advocacy throughout the City numerous times per year. (*See* Docs. 90-17 ¶¶ 3–4; 90-16 at 4.) She and her fellow demonstrators often "hold [their] signs to raise awareness and verbally provide information about [their] cause," and "distribute flyers and articles to pedestrians and occupants of vehicles stopped at red lights." (Doc. 90-17 ¶ 5.) She "typically engage[s] in political speech on sidewalks, street corners, and medians near busy intersections because [she] can reach the greatest number of people in those locations." (*Id.* ¶ 4.)

On January 11, 2018, Plaintiffs brought suit against the City alleging that the Ordinance "unconstitutionally infringes Plaintiffs' rights to exercise freedom of speech and expression in

traditional public for[a] by restricting a substantial volume of constitutionally protected speech without adequate justification."[4] (Compl. ¶ 41.) Following the close of discovery, Plaintiffs moved for summary judgment—arguing that the City failed to meet its burden to prove the Ordinance is a valid speech restriction under a First Amendment analysis and urging the Court to rule in their favor as a matter of law. (*See* Doc. 89 at 22–25.)[5] The City simultaneously filed three separate motions for partial summary judgment on discrete elements of the First Amendment analysis that are also addressed in Plaintiffs' all-encompassing motion.[6] (*See* Docs. 91; 92; 93.)

## I. Legal Standard

Summary judgment is appropriate when the Court, viewing the record in the light most favorable to the nonmoving party, determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[4] Plaintiffs' Complaint asserts that they bring this action under 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, and Article II, § 17 of the Constitution of the State of New Mexico. (See Compl. ¶¶ 54–56.) Plaintiffs' § 1983 and state law constitutional claims are, however, never briefed in their motion for summary judgment, beyond a footnote stating that "[t]he protections of § 17 are the same as (or greater than) those afforded by the First Amendment." (*See* Doc. 89 at 10 n.3.)

[5] Where internal document pagination differs from the CM/ECF pagination, the Court's citations refer to CM/ECF.

[6] The Court notes that "[a] party should ordinarily submit only one motion for summary judgment which contains all arguments and evidence in support . . . ." *United States v. Copar Pumice Co., Inc.*, No. CV 09-1201 JP/KBM, 2013 WL 12159365, at *3 (D.N.M. Sept. 12, 2013) (quotation omitted). By filing three separate motions, the City ensured that the Court was "inundated with multiple motions, response briefs, replies, declarations, and exhibits" on the issues of forum analysis, content neutrality, and significant government interest. *See id.* at *5. And, in addition to creating unnecessary "permutations of the page-limitation rule" *see id.* at *3 (quotation omitted), this additional briefing was largely redundant, as each motion directly addressed the same issues set forth in Plaintiffs' motion. While some redundancy in briefing is of course unavoidable in cross-motions for summary judgment, Plaintiffs were able to address all the elements of their First Amendment analysis in a single motion, and the Court laments that the City did not do the same.

A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *See id.*

A comparison of the proffered material facts and asserted disputes in all four motions reveals that the parties vigorously dispute the meaning and application of various aspects of First Amendment caselaw and dispute each other's characterizations of the facts. (*Compare* Doc. 89 at 10–21, *with* Doc. 107 at 4–23; Doc. 91 at 3–8, *with* Doc. 101 at 7–19; Doc. 92 at 3–4, *with* Doc. 102 at 6–11; Doc 93 at 2–9, *with* Doc. 103 at 6–17.) Still, they have asserted no genuine disputes of fact, let alone disputes of *material* fact, that would require a trial. Thus, the Court concludes that this matter is properly resolved on summary judgment.

## II.  Discussion

The First Amendment, which provides that "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. amend. I, applies to states and local governments through the Due Process Clause of the Fourteenth Amendment. *iMatter Utah v. Njord*, 774 F.3d 1258, 1263 (10th Cir. 2014) (citing *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 749 n.1 (1976); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n.1 (1996)). The First Amendment "reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open . . . .'" *Boos v. Barry*, 485 U.S. 312, 318 (1988) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Yet "nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985); *see also iMatter Utah*, 774 F.3d at 1263.

Plaintiffs' facial challenge to the Ordinance on the ground that it unconstitutionally encumbers free speech involves six distinct inquiries, which the Court will take up in turn:

1. **Does the Ordinance restrict protected speech?**
2. **If so, does the Ordinance implicate traditional public fora?**
3. **If so, is the Ordinance content neutral?**

If so, intermediate scrutiny applies, which involves three additional inquiries:

4. **Does the Ordinance address a significant government interest?**
5. **If so, is the Ordinance narrowly tailored to achieve that interest?**
6. **If so, does it leave open ample alternative channels of communication?**

As explained below, the Court concludes that (1) the Ordinance restricts protected speech; (2) the majority of the Ordinance implicates speech in traditional public fora (with the exception of Subsection (A), which the Court determines is a valid restriction on speech in nonpublic fora); (3) the Ordinance is content neutral; (4) the Ordinance addresses a significant government interest; but (5) the Ordinance is not narrowly tailored to achieve that government interest. Because the Court concludes that the majority of the Ordinance is unconstitutional based on the narrow tailoring inquiry, it does not consider alternative channels of communication.

### A. Protected Speech

The first step in a facial challenge to a law on the ground that it unconstitutionally encumbers free speech is obvious, "Plaintiffs must first establish that their activities are protected by the First Amendment." *Verlo v. Martinez*, 820 F.3d 1113, 1128 (10th Cir. 2016) (citing *Cornelius*, 473 U.S. at 797). Plaintiffs assert that the various types of speech that they commonly engage in, including passively soliciting donations by holding signs on medians and exit and entrance ramps, providing donations from a vehicle while stopped in traffic, and handing out informational leaflets to motorists, "fall within the heartland of constitutionally protected speech." (*See* Doc. 89 at 22–23.) The City does not dispute this assertion (*see generally* Doc. 107), and the Court agrees that Plaintiffs' activities constitute protected speech.

### A. Forum Analysis

Having established that the Ordinance impacts Plaintiffs' protected speech, the Court must next "identify whether the challenged restrictions impact a public or nonpublic forum, because that determination dictates the extent to which the government can restrict First Amendment activities within the forum." *Verlo*, 820 F.3d at 1128. The Supreme Court has identified three categories of government property that affect when and how speech may be regulated:

> (1) traditional public fora ("streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions"); (2) designated public fora ("public property which the State has opened for use by the public as a place for expressive activity"); and (3) nonpublic fora ("[p]ublic property which is not by tradition or designation a forum for public communication").

*Doe v. City of Albuquerque*, 667 F.3d 1111, 1128 (10th Cir. 2012) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (1983)). In a traditional public forum or designated public forum, the government may only restrict speech after satisfying the requirements of either strict or intermediate scrutiny to show that the restriction is narrowly crafted to achieve a government interest. *See Perry*, 460 U.S. at 45–46. On the other hand, "[a]ccess to a nonpublic forum 'can be restricted as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Evans v. Sandy City*, No. 17-4179, 2019 WL 2896507, at *2 (10th Cir. July 5, 2019) (quoting *Cornelius*, 473 U.S. at 800 (internal quotation omitted)).

Plaintiffs argue that the areas covered by the Ordinance—travel lanes, medians, and areas near the exit and entrance ramps of some roadways—fall into the "traditional public fora" category because they all fall under the broad definition of "streets." (*See* Docs. 89 at 23–24; 130 at 4.) "Albuquerque residents have long used these locations consistent with [the] understanding" that they are "integral parts of the public thoroughfares . . . ." (Doc. 89 at 23–24 (quotation marks and

citations omitted).) The City counters that the various components of streets implicated by the Ordinance are not traditional public fora simply because they fall under the technical definition of "streets." (*See* Doc. 91 at 9–10.) Instead, the City asserts that the Court "must conduct a more particularized inquiry . . . [t]o determine whether publicly owned property is a public forum." (*Id.* at 10.)

### Medians and the Areas Near Exit/Entrance Ramps are Traditional Public Fora

Streets and sidewalks have long been considered core examples of traditional public fora, and there is a conspicuous absence of controlling case law in which courts have found it necessary to conduct a particularized inquiry of the objective characteristics of streets, sidewalks, or medians to determine their forum status. *See Frisby v. Schultz*, 487 U.S. 474, 480 (1988) ("[w]e have repeatedly referred to public streets as the archetype of a traditional public forum" (citing *Boos*, 485 U.S. at 318; *Cornelius*, 473 U.S. at 802; *Perry*, 460 U.S. at 45). "Time out of mind public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum." *Id.* (quotation marks, brackets, and citation omitted).

In *Verlo v. Martinez*, however, the Tenth Circuit did recognize that despite this broad language, "not all streets and sidewalks are traditional public fora." 820 F.3d at 1138–39 (citation omitted). To support this conclusion, *Verlo* relied on several Supreme Court cases in which the parties disputed the categorization of public sidewalks surrounding or leading to public buildings as traditional public fora, so the Court analyzed the particular characteristics of those sidewalks to determine their forum status. *See id.* (citing *United States v. Kokinda*, 497 U.S. 720, 727 (1990); *United States v. Grace*, 461 U.S. 171, 179 (1983)) (subsequent citations omitted). Similarly, in *Satawa v. Macomb County Road Commission*, the Sixth Circuit undertook a particularized analysis of a 60-foot wide landscaped median in the middle of a busy roadway and ultimately held that "the

Mound Road median is best categorized as a traditional public forum. To be sure, it is not prototypical. Nevertheless, it is a place where people have long been able to gather, sit, and communicate, even though it separates traffic on a busy street." 689 F.3d 506, 522 (6th Cir. 2012).

Yet despite these limited examples of scenarios in which the forum status of an otherwise traditionally public forum is ambiguous for case-specific reasons, in most First Amendment challenges to regulations covering streets, sidewalks, and even medians, courts have found them to be, without question and without particularized analysis, traditional public fora. *See, e.g.*, *Cutting v. City of Portland*, 802 F.3d 79, 83 (1st Cir. 2015) ("the people of Portland have used median strips for expressive purposes in much the same way that they have used parks and sidewalks"); *Reynolds v. Middleton*, 779 F.3d 222, 225 (4th Cir. 2015) (there is "no question that public streets and medians qualify as traditional public for[a]") (quotation omitted); *Petrello v. City of Manchester*, No. 16-CV-008-LM, 2017 WL 3972477, at *18 (D.N.H. Sept. 7, 2017) ("the Ordinance regulates speech in traditional public for[a]. The pedestrian involved in a roadside exchange is necessarily located on or adjacent to the street, such as a sidewalk or median.").

Here, medians and the areas near exit and entrance ramps are often utilized by Albuquerque citizens to engage in speech, even if they were not specifically designed to encourage and accommodate pedestrian use. Plaintiffs have introduced deposition testimony to support their claim that "Albuquerque's citizens have long used the City's roadways—including medians and the roadside locations near highway exit and entrance ramps—for expressive activity" including panhandling, fundraising for organizations, advertising, and protesting. (Doc. 89 at 10–11 ¶ 1 (citing Docs. 90-1 at 20:21–21:9, 26:10–19, 27:6–20, 31:5–11; 90-2 at 16:14–17:2, 19:15–24; 90-3 at 23:13–16, 24:1–25:11, 27:7–28:7; 90-4 at 29:14–20, 30:10–18, 31:17–32:1; 90-5 at 22:12–22, 23:14–24:5; 90-6 ¶ 4; 90-7 at 22:13–24, 71:18–24).)

The City disparages Plaintiffs' proffered testimony as "simply describ[ing] witnesses' observations of pedestrian activity at various locations, including medians and highway exit and entrance ramps." (Doc. 107 at 4.) But if witness observations of pedestrians frequently engaging in expressive activity in the relevant locations are not sufficient to show that they have traditionally been utilized by the public for such purposes, it is unclear what evidence would be sufficient. Indeed, the fact that such areas have been frequently utilized by pedestrians is presumably what drove the City to adopt the Ordinance in the first place. Thus, like the majority of courts that have considered similar issues, the Court concludes that medians and the areas adjacent to entrance and exit ramp travel lanes constitute traditional public fora. Subsections (B), (C), (D), and (E)[7] thus implicate traditional public fora and must be analyzed under either intermediate or strict scrutiny following a content neutrality analysis.

### Travel Lanes are Not Traditional Public Fora

The Court is not convinced, however, that "travel lanes" contained within streets, which by their very definition are only those parts of a roadway "dedicated to the movement of motor vehicles traveling from one destination to another" § 8-1-1-2, have "[t]ime out of mind" been utilized for expressive speech. *Frisby*, 487 U.S. at 480 (quotation marks and citation omitted). The Tenth Circuit recently indicated that, while it could simply assume without deciding that the medians at issue in *Evans v. Sandy City* were public fora, the court had "serious reservations

_____

[7] The Court recognizes that, technically, Subsection (E) applies only to activity taking place in a travel lane because it prohibits the occupants of a vehicle in a travel lane from engaging in a physical exchange with a pedestrian. However, Subsection (E) appears to be inextricably intertwined with Subsection (D), as they combine to prohibit both parties from engaging in a physical exchange when the vehicle occupant is in a travel lane and the pedestrian is somewhere other than the travel lane. Physical exchanges where the pedestrian too was standing in the travel lane would technically not implicate any traditional public fora (as discussed below). However, because Subsection (D) applies broadly to any pedestrian standing in any space adjacent to a travel lane (including a sidewalk, median, or shoulder) the Court concludes that, as a practical matter, Subsections (D) and (E) together implicate traditional public fora.

extending such conclusions to . . . 17-inch traffic dividers that have hardly been 'by long tradition . . . devoted to assembly and debate.'" *Evans*, 2019 WL 2896507, at *2 n.2 (quoting *Perry*, 460 U.S. at 45) (subsequent citation omitted). Though the Court joins the majority of courts that have actually ruled on the issue to conclude that medians as a broad category are traditional public fora, the Court shares the Tenth Circuit's "serious reservations" when it comes to extending traditional public forum status to travel lanes—a component of modern roadways that similarly "have hardly been 'by long tradition . . . devoted to assembly and debate.'" *See id.* at *2 n.2 (citations omitted). Thus, the Court will undertake a particularized analysis to determine if travel lanes are traditional public fora.

"Traditional public fora are defined by the objective characteristics of the property." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). "This is not to say the government has automatically created a public forum by opening property to the public, but if it has so opened the property, objective characteristics determine whether it is a public forum." *First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114, 1125 (10th Cir. 2002) (citing *Grace*, 461 U.S. at 177). "The most important considerations in this analysis" include "whether the property shares physical similarities with more traditional public for[a], whether the government has permitted or acquiesced in broad public access to the property, and whether expressive activity would tend to interfere in a significant way with the uses to which the government has as a factual matter dedicated the property." *Id.* (quoting *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 698–89 (1992) (Kennedy, J., concurring)).

The record does not demonstrate that "the government has permitted or acquiesced in broad public access" to travel lanes for purposes of expressive speech. *See id.* (quotation omitted). Indeed, none of the testimony Plaintiffs cite to make the case for the historical use of medians,

roadsides, and sidewalks for expressive activity mentions such activity taking place in a travel lane. (*See generally* Docs. 90-1; 90-2; 90-3; 90-4; 90-5; 90-6; 90-7.) Nor do Plaintiffs describe any of their expressive speech that is restricted by the Ordinance as involving standing in travel lanes. (*See*, *e.g.*, Docs. 90-9 at 15:10–13 (Ms. Brewer explaining that she seeks donations by standing "[o]n a median. Sometimes at a freeway exit or entrance."); 90-17 ¶ 4 (Ms. Sanchez demonstrates on "sidewalks, street corners, and medians . . . .").)

To the contrary, Ms. Brewer has even emphasized that her speech does *not* take place in travel lanes. (*See* Doc. 90-9 at 29:13–25 (indicating that she would never cross travel lanes to accept a proffered donation from a motorist because "that light could turn green on my way back . . . [and it] would be very dangerous").) Mr. McCoy's and Ms. O'Grady's expressive activity arguably does take place mostly in travel lanes because they offer donations from their car windows. (*See* note 7, *supra*; *see also* Docs. 90-6 ¶ 6; 90-14 ¶¶ 6, 9.) But, as their purpose is to make contact with individuals who are *not* in travel lanes (*see id.*), the Court concludes that the fact that individuals hand out donations from their car windows while in travel lanes does not mean that all travel lanes have historically been open to the public for assembly and debate.

The Court next considers whether travel lanes "share[] physical similarities with more traditional public for[a] . . . ." *See Salt Lake City Corp.*, 308 F.3d at 1125 (quotation omitted). Travel lanes may share some very basic physical similarities with sidewalks, roadside shoulders, and medians, given that they are all components of "streets." However, this factor carries less weight in the analysis than the final factor, significant interference, because speech expressed by standing in travel lanes clearly could "interfere in a significant way with the uses to which the government has as a factual matter dedicated the property." *See id.* Travel lanes are physically, lawfully, and often constantly occupied by moving vehicles. Vehicles may sometimes pull over

onto a shoulder, but shoulders, medians, and sidewalks are certainly not dedicated to constant moving vehicle traffic. Travel lanes, on the other hand, "are intended to accommodate vehicular traffic (or, in some instances, bicycle traffic) that is either in motion or is temporarily stopped because of a traffic signal or because of congestion." (Doc. 77-1 at 6.)

Thus, the Court concludes that travel lanes in the City of Albuquerque, as defined in the Traffic Code, are not traditional public fora. *See* § 8-1-1-2. Subsection (A) of the Ordinance, which makes it "unlawful for any person to stand in any travel lane of a street, highway, or controlled access roadway or in any travel lane of the exit or entrance ramps thereto[,]" § 8-2-7-2(A), accordingly applies only to nonpublic fora and is constitutional so long as "the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view." *Cornelius*, 473 U.S. at 800 (quotation marks, brackets, and citation omitted). It is entirely reasonable to prohibit pedestrians from standing in travel lanes, as travel lanes are the portion of the street where moving vehicles are most likely to endanger pedestrians and pedestrians standing in travel lanes will likely obstruct or hinder the free flow of traffic. The prohibited act of "standing" does not express or convey any sort of viewpoint, so Subsection (A) is a valid restriction on speech in a nonpublic forum.[8] Thus, the Court will grant in part the City's motion for partial summary judgment on the issue of forum analysis (Doc. 91) in regard to Subsection (A) and deny it as to all other subsections, and deny in part Plaintiffs' motion for summary judgment (Doc. 89) as it relates to the constitutionality of Subsection (A).[9]

---

[8] The Court notes that, even if it had reached the narrow tailoring analysis on this issue, it would likely have found that the City's decision to limit the standing ban just to those areas that truly present objective safety and obstruction risks—travel lanes—would still satisfy the narrow tailoring requirement.

[9] Both bills enacting the Ordinance include a severability clause noting that "[i]f any section, paragraph, sentence, clause, word or phrase of this ordinance is for any reason held to be invalid or unenforceable by any court of competent jurisdiction, such decision shall not affect the validity of the remaining provisions of this ordinance." *See* Council Bills O-19-66 at 6 (*see also* Doc. 133-1); O-17-51 at 5 (*see also* Doc. 90-

## B.  Content Neutrality Analysis

Next, having determined that Subsections (B)–(E) implicate traditional public fora, "the court must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Doe*, 667 F.3d at 1130 (quoting *Wells v. City & Cty. of Denver*, 257 F.3d 1132, 1139 (10th Cir. 2001)) (quotation marks omitted). In a traditional public forum, the level of scrutiny depends on whether the restrictions are content neutral (where intermediate scrutiny applies) or content based (where strict scrutiny applies). "[T]he government may only impose content-neutral time, place, and manner restrictions that: (a) serve a significant government interest; (b) are narrowly tailored to advance that interest; and (c) leave open ample alternative channels of communication." *Id.* at 1130–31 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (subsequent citation omitted). If the restrictions are based on the communicative content of the restricted speech, on the other hand, they are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015).

The City argues that the Ordinance is content neutral on its face because "[b]y its express terms, the Ordinance regulates the locations at which pedestrians can stand in relation to traffic, . . . does not regulate speech or the content or viewpoint of speech conveyed therein," and "is also 'silent . . . concerning any speaker's point of view.'" (Doc. 93 at 12, 14 (quoting *City Council of*

---

29). Severability is determined by state law, and while "[t]he existence of a severability clause is 'not an inexorable command' that an ordinance is" severable, "it 'does raise this presumption.'" *See Swepi, LP v. Mora Cty.*, 81 F. Supp. 3d 1075, 1203 (D.N.M. 2015) (quoting *Barber's Super Mkts., Inc. v. City of Grants*, 458 P.2d 785, 788 (N.M. 1969)). "If the valid portions are inextricably intertwined with the invalid portions so that they cannot be separated without substantially affecting the ordinance, then the entire ordinance must be invalidated." *Id.* (quotation omitted). Here, the Court concludes that Subdivision (A) clearly serves the Ordinance's stated goal of reducing pedestrian-vehicle conflicts and is not intertwined with the other provisions of § 8-2-7-2 such that it cannot stand on its own. Thus, the Ordinance's severability clause is valid and § 8-2-7-2(A) may be severed from the remaining provisions.

*L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 904 (1984)).) Further, the City asserts that its purpose and justification for enacting the law are equally content neutral, as "they are premised on pedestrian safety and limiting pedestrian-vehicle conflicts rather than on limiting free expression." (*Id.* at 18.) Plaintiffs respond that the physical exchange ban is content based on its face and that the remaining provisions may be facially content neutral, but there is a genuine dispute of fact "as to whether the City passed the Ordinance to target certain speech based on its content." (Doc. 103 at 5, 17.) According to Plaintiffs, "there is ample evidence in the record that the City's 'purpose' in adopting the Ordinance was to curtail a particular type of speech by a particular class of speaker—requests for donations from panhandlers." (*Id.* at 5, 20–21.)

A regulation is content based on its face if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 135 S. Ct. at 2227. "This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.* (citations omitted). The Supreme Court has "also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be 'justified without reference to the content of the regulated speech,' or that were adopted by the government 'because of disagreement with the message [the speech] conveys . . . .'" *Id.* (citing *Ward*, 491 U.S. at 791). Both types of content-based restrictions trigger strict scrutiny in analyzing the law, so the Court must satisfy both prongs of the content neutrality analysis "before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Id.* at 2228.

The first prong of the analysis is easily disposed of here—the entire Ordinance is content neutral on its face. Each provision restricts *where or how* individuals may conduct expressive activity in Albuquerque, but no provision draws distinctions based on the content of that speech.

Plaintiffs concede that Subsections (A)–(C) are facially content neutral, but argue that Subsections (D) and (E) are facially content based by relying heavily on *Rodgers v. Stachey*, No. 6:17-CV-06054, 2019 WL 1447497, at *1 (W.D. Ark. Apr. 1, 2019). In *Rodgers*, the court held that an ordinance containing a physical exchange ban nearly identical to Albuquerque's was content based because the act of physical exchange is itself "content." *Id.* Reasoning that physical interactions are "visceral and instinctive," the Court held that "[i]t matters not that the Ordinance does not prohibit with specificity the exact messages delivered through physical interaction. . . . The content of the outlawed messages is physical interaction." *Id.* at *7–8.

Plaintiffs are correct that "there is no basis for distinguishing the prohibition contained in Subsections (D) and (E) from the one at issue in *Rodgers*" (Doc. 103 at 19), but the Court considers the conclusion in *Rodgers* itself flawed and will not adopt it here. Though the Court agrees with the *Rodgers* court's broad characterization of the importance of physical interaction, it simply cannot agree that the physical nature of an exchange is the *content* of that speech as well as the manner and method of speech. Plaintiffs argue that the provisions banning physical exchanges "criminalize a specific type of speech by vehicle occupants—an expression of immediate financial support to the roadside panhandler—while permitting a host of other speech within a travel lane, such as haranguing the panhandler to get a job, or asking her for driving directions." (*Id.*) But the Ordinance does not, on its face, criminalize only expressions of immediate financial support to the roadside panhandler. It criminalizes *all* physical exchanges. It criminalizes a protester handing a driver a leaflet and a candidate handing a driver campaign materials. And it would criminalize a driver handing a panhandler a *note* haranguing the panhandler to get a job, or a pedestrian handing a driver written driving directions. These examples show that Subsections (D) and (E) cannot honestly be construed to criminalize, on their face, speech based on its content.

Having determined that the entire Ordinance is facially content-neutral, the Court must next determine whether it should nevertheless be subject to strict scrutiny because it "cannot be 'justified without reference to the content of the regulated speech,'" or was "adopted by the government 'because of disagreement with the message [speech] conveys . . . .'" *Reed*, 135 S. Ct. at 2227 (citing *Ward*, 491 U.S. at 791). "It is at least open to question whether, in a First Amendment Free Speech case, the court should even attempt inquiry into the 'real' legislative intent." (Doc. 92-1 (*McCraw v. City of Okla. City*, No. Civ-16-352-HE, at *17 (W.D. Okla. Dec. 19, 2018), *appeal docketed*, No. 19-6008 (10th Cir. Jan. 17, 2019).) Caselaw on the topic is relatively sparse, as many restrictions held to be content based are found to be so on their face (rendering inquiry into the justification prong unnecessary). *See, e.g.*, *Reed*, 135 S. Ct. at 2227 (finding an ordinance that regulated signs based on what message they conveyed was "content based on its face"); *Thayer v. City of Worcester*, 144 F. Supp. 3d 218, 233 (D. Mass. 2015) (ordinance prohibiting "aggressive panhandling" was content based on its face).

In other cases, laws found to be content neutral on their face have also been found, without much analysis, to have content neutral justifications. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 480, 502 (2014) (holding that the government's proffered justifications including public safety were content-neutral justifications for an abortion buffer zone restriction, rejecting Justice Scalia's concurring analysis that "every objective indication shows that the provision's primary purpose is to restrict speech that opposes abortion"); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986) (ordinance prohibiting adult theaters in certain areas "by its terms [was] designed to prevent crime, protect the city's retail trade, maintain property values, . . . not to suppress the expression of unpopular views"); *Evans*, 2019 WL 2896507, at *3 (a city councilor's question

about issuing citations to homeless people and a subsequent statement alluding to panhandling "most certainly do[] not turn the Ordinance into a content-based restriction").

The parties cite various cases to argue whether underlying motives are relevant in determining the constitutionality of a statute (*see* Docs. 93 at 21–23 (collecting cases); 103 at 22–25 (collecting cases)), yet none of their citations directly bear on whether an unofficial justification is relevant to determining whether to apply strict or intermediate scrutiny in the First Amendment context. However, one case in which the Supreme Court *did* find a speech restriction to be content based even after finding that it was facially neutral is instructive. In *United States v. Eichman*, 496 U.S. 310, 315–16 (1990), the Court considered a ban on burning or defacing the American flag, finding first that it was facially content neutral. However, subsequent analysis of the government's justification and reasons underlying the adoption of the ban revealed that the statute was content based, though it applied neutrally on its face:

> Although the Flag Protection Act contains no explicit content-based limitation on the scope of prohibited conduct, it is nevertheless clear that the Government's asserted interest is related to the suppression of free expression and concerned with the content of such expression. The Government's interest in protecting the "physical integrity" of a privately owned flag rests upon a perceived need to preserve the flag's status as a symbol of our Nation and certain national ideals. But the mere destruction or disfigurement of a particular physical manifestation of the symbol, without more, does not diminish or otherwise affect the symbol itself in any way[,] . . . [so] the Government's desire to preserve the flag as a symbol for certain national ideals is implicated only when a person's treatment of the flag communicates [a] message to others that is inconsistent with those ideals.

*Id.* (quotation marks and citations omitted).

Persuasive caselaw on this issue, sparse as it is, thus suggests that the second prong of the content-neutrality analysis is meant to assess whether the government's proffered justification for a facially content-neutral restriction is in fact content neutral. This interpretation is supported by the majority holding in *McCullen*, which rejected Justice Scalia's extensive argument that the *real*

legislative intent behind an abortion clinic buffer zone restriction was a desire to limit anti-abortion speech. 573 U.S. at 480 (finding the law "justified without reference to the content of the regulated speech" because "[i]ts stated purpose is to increase forthwith public safety at reproductive health care facilities") (quotation marks and citations omitted). The Court thus applied intermediate scrutiny. *See id.* Thus, the Court concludes that the purpose of the second prong of the content neutrality analysis is to determine whether the government has presented a truly content neutral justification for the restriction, not ferret out any and all underlying justifications that may exist.

It is certainly clear that many Albuquerque citizens, including Councilor Jones, have expressed personal opposition to panhandling and/or concern about the frequency of panhandling in the City. (*See, e.g.*, Docs. 90-1 at 23:3–5, 28:16–29:25; 90-5 at 22:7–11; 90-19; 104-3; 104-6 at 40:13–41:25; 104-7.) Councilor Jones even emailed a constituent: "Please support my Ordinance to keep beggars and others out of our medians and from approaching motorists." (Doc. 104-3 at 2.) After reviewing the record, it would be disingenuous to pretend that the Ordinance is completely unrelated to panhandling. The important question, however, is whether the City presented a truly content-neutral justification for the Ordinance, and the Court concludes that it has done so by proffering the public safety justification reflected in the Ordinance's preamble and repeated throughout the briefing in this case. (*See* Doc. 90-29 at 3–5.) The Court is not inclined to completely disregard the City's proffered justifications for enacting the Ordinance and replace them with a hodgepodge of councilor statements, emails, and general citywide discontent with panhandling—none of which are reflected in the Ordinance itself. The Court will grant the City's Motion for Partial Summary Judgment on the Issue of Content Neutrality (Doc. 93).

### C. Time, Place, and Manner Restriction Analysis

As Subsections (B) through (E) of the Ordinance are content neutral, the City next bears the burden of proving its time, place, or manner restrictions "(a) serve a significant government

interest; (b) are narrowly tailored to advance that interest; and (c) leave open ample alternative channels of communication." *Doe*, 667 F.3d at 1130–31 (citing *Ward*, 491 U.S. at 791).

### i. The City has a significant government interest in pedestrian safety.

"[I]n reviewing the constitutionality of a restriction or policy, a court must consider the government interest sought to be advanced[,]" because "only by discerning the interest to be served by a restriction can a court proceed to determine whether the restriction is sufficiently tailored to advance that interest." *Id.* at 1132 (10th Cir. 2012) (citing *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315 (2000)) (subsequent citations omitted). In *McCullen*, the Supreme Court held that the government could rely on caselaw to assert significant government interests in public safety and maintaining unobstructed sidewalks outside abortion clinics, suggesting that detailed empirical evidence is not necessary to assert a significant government interest. *See* 573 U.S. at 486–87 ("we have . . . previously recognized the legitimacy of the government's interests in ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services. The buffer zones clearly serve these interests.") (quotation marks and citations omitted).

Despite Plaintiffs' vehement arguments to the contrary (*see* Doc. 102 at 11–14), the Court concludes that the Supreme Court's guidance in *McCullen* is clear on this issue—governmental interests that have been held to be significant time and again in controlling case law need not be proved "significant" on a case-by-case evidentiary basis in order to satisfy the significant government interest requirement. *See* 573 U.S. at 486–87. Indeed, in most cases decided since *McCullen*, courts have accepted a significant governmental interest in traffic safety without much objective evidence. *See, e.g.*, *Cutting,* 802 F.3d at 86 (an interest in public safety "is a legitimate and significant one, as the Court most recently recognized in *McCullen*"); *Petrello*, 2017 WL

3972477, at *19 ("the government has a significant and legitimate interest in protecting public safety and promoting the free flow of traffic on streets. The Ordinance, which restricts interactions between pedestrians and vehicles on the road, is intended to serve those interests.") (citations omitted); *Reynolds*, 779 F.3d at 229 ("Even without evidence of injuries or accidents involving roadway solicitors, we believe the County's evidence, particularly when it is considered along with a healthy dose of common sense, is sufficient to establish that roadway solicitation is generally dangerous."); *Rodgers*, 2019 WL 1447497, at *8 (finding a *compelling* state interest in promoting traffic safety without any specific evidence tied to the disputed ordinance); *Evans*, 2019 WL 2896507, at *4 ("the Ordinance promotes public safety in a direct and effective way by keeping pedestrians off thin slices of pavement and unpaved traffic dividers where pedestrians could be injured by passing traffic.").

Though the City relies mostly on anecdotal evidence and common sense to support its claim that the Ordinance will reduce pedestrian accidents (*see* Doc. 107 at 32–38), the Court is loath to say here that promoting public safety and "minimizing pedestrian-vehicle conflicts" in Albuquerque are not significant government interests. (*See id.* at 32.) The City has asserted that it has an interest in improving safety on streets and roadways by reducing conflict between vehicles and pedestrians, and indeed, Albuquerque had one of the highest pedestrian fatality rates among similarly sized cities within the last five years. (*See id.* at 17.) On this issue, the Court thus grants the City's motion for partial summary judgment (Doc. 92) and holds that reducing pedestrian-vehicle conflicts is a significant government interest.

### ii. The Ordinance is not narrowly tailored.

Finally, the Court turns "to the hotly contested question: whether the Ordinance is narrowly tailored to serve that interest." *Evans*, 2019 WL 2896507, at *4. For this intermediate level of

scrutiny, the Tenth Circuit "looks 'to the amount of speech covered by the ordinance and whether there is an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve.'" *Evans*, 2019 WL 2896507, at *4 (quoting *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 165 (2002)). "Although a time, place, or manner restriction must be narrowly tailored to serve a significant governmental interest, 'it need not be the least restrictive or least intrusive means of doing so.'" *Doe*, 667 F.3d at 1133 (quoting *Ward*, 491 U.S. at 798). "Rather, the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation without burden[ing] substantially more speech than is necessary to further the government's legitimate interests." *Id.* (quoting *Ward*, 491 at 799) (quotation marks omitted); *see also Verlo*, 820 F.3d at 1134.

As with the significant government interest prong, there is no clear rule dictating what type of evidence the City must marshal to meet its burden and show, by a preponderance of evidence, that the Ordinance is narrowly tailored.[10] However, the most recent guidance from the Supreme Court again comes from *McCullen*, in which the Court struck down an abortion buffer zone restriction because it was not narrowly tailored to serve the government's significant interests in promoting public safety, free flow of sidewalk traffic, and access to health care. *See* 573 U.S. at 490. In *McCullen*, the petitioners were "sidewalk counselors" who attempted to dissuade women entering clinics from seeking abortion services. *Id.* at 472. They challenged a state law that created buffer zones outside all abortion clinics in the Commonwealth of Massachusetts and "carve[d] out

---

[10] While the City bears the burden of proof to show that the Ordinance is narrowly tailored, the narrow tailoring inquiry is the only discrete part of the First Amendment analysis on which the City has *not* moved for partial summary judgment. Plaintiffs' motion does, however, address narrow tailoring (*see* Doc. 89), so in analyzing the narrow tailoring issue the Court considers Plaintiffs to be the movants and will thus construe all relevant facts in the light most favorable to the City.

a significant portion of the adjacent public sidewalks, pushing petitioners well back from the clinics' entrances and driveways . . . [and] compromis[ing their] ability to initiate the close, personal conversations that they view[ed] as essential to 'sidewalk counseling.'" *Id.* at 487. The restriction also made it "substantially more difficult for petitioners to distribute literature to arriving patients[,] . . . [thus] depriv[ing them] of their two primary methods of communicating with patients[,]" personal conversation and leafletting. *Id.* at 466, 488.

In holding that the restriction burdened substantially more speech than was necessary to achieve its safety goal, the Court reasoned that while the sidewalk counselors had been able to engage in speech in other manners and at other locations, the alternatives were far less successful in achieving their objectives. *See id.* at 489. The Court went on to list several alternative measures to illustrate that the state "ha[d] available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate[,]" like enforcing existing ordinances that prohibited blocking driveways or enacting an anti-harassment ordinance *Id.* at 490–94.

Further, the Court concluded that the Commonwealth's actual evidence of safety and obstruction issues outside clinics appeared limited to one clinic in Boston on Saturdays, and that "[f]or a problem shown to arise only once a week in one city at one clinic, creating 35-foot buffer zones at every clinic across the Commonwealth is hardly a narrowly tailored solution." *Id.* at 493. The Commonwealth failed to meet its burden of proof on the narrow tailoring prong because it had "not shown that it seriously undertook to address the problem with less intrusive tools readily available to it. Nor [had] it shown that it considered different methods that other jurisdictions have found effective." *Id.* at 494.

*McCullen* thus creates a roadmap for conducting a narrow tailoring inquiry, making it clear that while the existence of a significant government interest may be adequately supported by prior caselaw and common sense, the government must present case-specific evidence that the restriction actually serves the stated goal without burdening too much speech in order to satisfy the narrow tailoring inquiry. *See Reynolds*, 779 F.3d at 228–29 (*McCullen* makes "it clear that intermediate scrutiny does indeed require the government to present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden.")

The Tenth Circuit has clarified, however, that the Supreme Court's holding in *McCullen* did not "create a new evidentiary requirement for governments to compile data or statistics." *See Evans*, 2019 WL 2896507, at *5. In *Evans*, the Tenth Circuit held that an ordinance prohibiting "sit[ting] or stand[ing], in or on any unpaved median, or any median of less than 36 inches . . . ." was narrowly tailored. *Id.* at *1. The court reasoned that, unlike in *McCullen* where the sidewalk counselors were genuinely unable to effectively disseminate their message to their target audience after the commonwealth imposed buffer zones, the plaintiff in Evans received citations for standing on a narrow median and panhandling when "a mere ten feet away from where he was cited, the median [was] wider than 36 inches and [was] therefore unaffected by the Ordinance." *Id.* at *5. "We simply cannot accept this ten-foot difference *on the same median* as a substantial burden on speech. In compliance with the Ordinance, Evans can stand on wide, paved medians to communicate effectively with his target audience." *Id.*

The court also reasoned that, even without direct evidence of pedestrian injuries through official accident reports and the like, "a direct relationship exist[ed] between the City's goal of promoting public safety and the restriction on speech it selected[,]" because the ordinance was

"limited only to those medians where it is unsafe to sit or stand." *Id.* at *6. The Tenth Circuit was

satisfied that the evidence demonstrated narrow tailoring when it included anecdotal evidence of

"several close calls" where pedestrians were almost injured on medians, *id.* at *3, and:

> [t]he City police captain—a City official who had years of experience dealing with unsafe situations involving pedestrians on medians in Sandy City—conducted a survey of the medians in Sandy City. The City prosecutor also surveyed the medians within the City. Based on what they observed, the City drafted the Ordinance limiting it only to those medians where it would be dangerous to sit or stand at any time of day, at any traffic speed or volume.

*Id.* at *6.

Other courts that have reached the narrow tailoring prong for similar ordinances have also

found that case-specific evidence is a crucial factor in the analysis. In *Cutting*, the First Circuit

held that a complete ban on standing on all medians in the city was not narrowly tailored because

it was geographically over-inclusive, evidence of some damaged medians and reports of vehicles

driving onto medians was not sufficient to show that significant danger existed at all medians, and

the city's argument that alternative measures were not "proactive" in addressing the problem were

not persuasive. 802 F.3d at 87–92; *see also Thayer*, 144 F. Supp. 3d at 237–38 (prohibition on

walking or standing on traffic islands and roadways was not narrowly tailored because "the City

has not shown that it seriously undertook to address the problem with less intrusive tools readily

available to it. Instead, it sacrificed speech for efficiency") (quoting *Cutting*, 802 F.3d at 92)

(quotation marks omitted).

In *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, the Ninth Circuit

held that an ordinance prohibiting standing on a street or highway and soliciting failed the narrow

tailoring inquiry because "it regulate[d] significantly more speech than [was] necessary to achieve

the City's purpose of improving traffic safety and traffic flow at two major Redondo Beach

intersections, and the City could have achieved [its] goals through less restrictive measures, such

as the enforcement of existing traffic laws and regulations." 657 F.3d 936, 940–41 (9th Cir. 2011).

"The City has offered no evidence to justify extending its solicitation ban throughout the City in

such a sweeping manner[,]" and because the city bears the burden of proving narrow tailoring, "we

cannot simply assume that the City's other streets, alleys, and sidewalks allegedly suffer from

similar solicitation-related traffic problems." *Id.* at 949. *See also Reynolds*, 779 F.3d at 225

(striking down a similar ordinance that applied to all county roads and medians, regardless of

location or traffic volume, even though "[t]he County's evidence . . . established, at most, a

problem with roadway solicitation at busy intersections in the west end of the county." *Id.* at 231.

And, in *Traditionalist American Knights of the Ku Klux Klan v. City of Desloge*, where the

Eighth Circuit ultimately upheld a ban on solicitation in roadways, the court relied heavily on the

fact that the city had hired a traffic safety consultant prior to drafting the ordinance. 775 F.3d 969,

973 (8th Cir. 2014). The expert had "prepare[d] a report identifying and evaluating any safety

issues raised by pedestrian distributions or solicitations on public roadways[,]" and "[i]n contrast

to *McCullen,* the record . . . [did] not show an obvious, less burdensome alternative that the city of

Desloge should have selected." *Id.* The Court thus held that the restriction on solicitation addressed

"a real, not speculative danger[,]" and was narrowly tailored because leafletting could still take

place in other public locations throughout the city and even at some stop signs where pedestrians

could stand on a sidewalk. *See id.* at 975–76 (citation omitted).

Here, Plaintiffs have argued at each stage of the First Amendment inquiry that the

Ordinance will not actually increase pedestrian safety in any meaningful way, and these arguments

go to the heart of the narrow tailoring argument. While *McCullen* did not lay out a "new rule"

regarding narrow tailoring, it makes clear that the narrow tailoring inquiry is where the government

bears the burden of producing concrete evidence to show that its proposed restriction will actually

achieve its asserted interest without burdening substantially more speech than necessary. *See* 573 U.S. at 496. The Court will thus assess the City's proffered evidence for each subsection of the Ordinance, keeping in mind that while no factor discussed in the cases above is necessarily required or dispositive, the City must provide some form of evidence to show that "the means fit closely with the ends." *See Evans*, 2019 WL 2896507, at *7.

**Subsection (B) is not narrowly tailored.**

The City contends that the entire Ordinance is narrowly tailored because it applies only to "specific locations within the roadway that are not designed for pedestrian use or for pedestrian-vehicle interactions." (Doc. 107 at 38.) The City argues that "[P]laintiffs cannot reasonably dispute that the areas targeted by the Ordinance are not designed for pedestrian use" (*id.* (citing Doc. 108-11 at 54:4–9)), because Albuquerque's "roadways are designed in an effort to minimize conflicts or interaction between vehicles, pedestrians, and bicyclists . . . ." (*Id.* (citing Doc. 77-1 at 3).) Further, the City points to its "anecdotal examples of harm or risk to safety[,]" including "pedestrians being harmed by vehicles while on medians . . . examples in which vehicles strike or drive onto medians, even though pedestrians might not have been present at the moment[,]" and instances "in which physical interactions between pedestrians and motorists in a travel lane created unsafe situations including collisions." (*Id.* at 36.)

The Ordinance's preamble repeatedly references a University of New Mexico Study that focused on the ten intersections in Albuquerque with the highest numbers of pedestrian and bicyclist-involved crashes and proposed five categories of "countermeasures" to improve pedestrian and bicyclist safety at these intersections.[11] (*See* Docs. 90-28 at 3; 90-29 at 3–5.) While

---

[11] The UNM Study suggests extending the time pedestrians have to cross the street during green lights, installing barriers on medians to prevent jaywalking, implementing measures to reduce vehicle speed approaching certain intersections, and installing flashing warning signs to improve safety at dawn and dusk.

the Court does not suggest that the City should have adopted these measures in the Ordinance, the fact that the UNM Study does *not* recommend a blanket ban on pedestrian presence in certain areas (*see generally* Doc. 90-28) demonstrates that the Study may be strong evidence that a pedestrian-vehicle conflict problem *exists*, but is not strong evidence that each provision of the Ordinance is narrowly tailored to address that problem.

The City asserts that "the City Council relied on much more than the UNM Study when it chose to enact the Ordinance[,]" including "alarming" NHTSA statistics concerning pedestrian fatalities in Albuquerque, "information from APD regarding the safety risks its officers observed in the community," and their own (and their constituents') anecdotal experiences. (*See* Docs. 107 at 37; 108-1 at 83:21–84:11, 85:25–86:4; 93:8–19, 95:5–20, 97:21–23; 108-11 at 45:7–25, 93:6–97:23.) Giving great weight to APD officers' observations and perceptions of safety risks throughout the City, these statistics and anecdotes simply offer no concrete evidence that the restrictions the City ultimately chose to enact were actually tailored to address the issue. Instead, they merely affirm the uncontroversial proposition that pedestrian proximity to high-volume roadways can be dangerous and the risk increases as vehicle speed increases.

There is no evidence in the record that the City's ban on "access[ing], us[ing], occupy[ing], congregat[ing] or assembl[ing]" within six feet of the travel lane of most entrance and exit ramps to Albuquerque's interstates and high-volume controlled access roadways is tailored in any way to best minimize vehicle-pedestrian conflicts. *See* § 8-2-7-2(B). Instead, it bans *all* presence in such areas and, though the Ordinance "identifies by name the specific highways and controlled access roadways that are referenced in that subsection[,]" the City has not offered any evidence to

---

(*See* Doc. 90-28 at 3.) There is one brief reference in the study to pedestrians crossing roads outside of crosswalks for purposes including "asking for donations." (*Id.* at 7.)

indicate which, if any, areas adjacent to ramps are still available for pedestrian use and why certain controlled access roadways were selected. (*See* Doc. 133 at 3.)

In support of its argument that Subsection (B) is narrowly tailored, the City cites only Ms. Lozoya's expert opinion that she believes the ban on standing adjacent to high speed roadways and ramps furthers the City's proffered safety goal. (Doc. 107 at 22, 38–39.) Ms. Lozoya testified that:

> With an increase in volume and speed of traffic, the risk of injury or death to pedestrians also increases. Studies by the [NHTSA] have shown that higher vehicle speeds result in a greater likelihood of pedestrian crash occurrence and more serious pedestrian injuries. It was estimated that only 5 percent of pedestrians die when struck by a vehicle traveling at 20 miles per hour or less. This compares with fatality rates of 40, 80, and nearly 100 percent for striking speeds of 30, 40, and 50 miles per hour or more respectively. . . . **[T]he prohibitions in [the Ordinance] against standing or congregating on or near higher-speed roadways and/or the entrance or exit ramps to those roadways furthers the goal of avoiding dangerous pedestrian-vehicle conflicts.**

(Doc. 77-1 at 5–6 (emphasis added).)

That this sweeping statement is the City's main evidence in support of Subsection (B) betrays the lack of narrow tailoring in the entrance and exit ramp ban. Certainly, NHTSA statistics that danger to pedestrians increases as speed increases makes sense. But why would such statistics prove that the same safety risks apply across the board to standing on or *near* such roadways? Or on or near the *ramps* to such roadways? Surely standing on a high-speed roadway is objectively riskier than standing near one. Further, Ms. Lozoya's testimony fails to show that the safety risk associated with standing near exit ramps is the same as the risk posed by standing near entrance ramps, yet Subsection (B) merges the two into a single prohibition without explanation. Common sense would suggest that standing near decelerating vehicles poses a lesser risk than proximity to accelerating vehicles. Regardless, the City's blanket statements about safety and traffic engineering and design principles fail to demonstrate any attempt at narrow tailoring.

To be clear, however, the Court is not asserting that standing near moving traffic on the shoulder of an exit or entrance ramp is not dangerous. This is an inherently risky activity, and banning all pedestrians from such areas would certainly ensure that pedestrian-vehicle conflicts would occur less often there. But "[a]lthough the City need not necessarily employ the least-restrictive alternative, it may not select an option that unnecessarily imposes significant burdens on First Amendment-protected speech. 'If the First Amendment means anything, it means that regulating speech must be a last—not first—resort.'" *See Redondo Beach*, 657 F.3d at 950 (quoting *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373, (2002)).

Here, as in *McCullen*, Plaintiffs find the areas they use to engage in their expressive speech to be far superior in achieving their expressive purposes than sidewalks or parking lots. (*See* Docs. 89 at 12–13; 90-6 ¶ 8; 90-9 at 87:17–89:7; 90-10 ¶ 15; 90-14 ¶ 15; 90-17 ¶ 10.) *See also McCullen*, 573 at 489 ("respondents have not refuted petitioners' testimony that the conversations have been far less frequent and far less successful since the buffer zones were instituted"). It is probable that a more tailored prohibition could successfully, and constitutionally, increase safety near entrance and exit ramps. The City has failed in this attempt, however, to show that *all* pedestrian presence near *all* the ramps covered by the Ordinance is equally dangerous and must be completely prohibited in order to successfully minimize pedestrian-vehicle conflicts.

### Subsection (C) is not narrowly tailored.

Next, the Court concludes that while Subsection (C) banning standing on most medians less than six feet wide is the most tailored of the Ordinance's provisions, the City has not shown that it is narrowly tailored to survive intermediate scrutiny. The City again asserts its overarching argument that the Ordinance does not excessively burden speech because it only bans pedestrians from areas that were designed with vehicles, not pedestrians, in mind. (*See* Doc. 107 at 39–40.)

The preamble to the bill narrowing Subsection (C) states that "notwithstanding that occupancy of any median by pedestrians is discouraged," the Ordinance "attempts to identify and prohibit the use by pedestrians of only those medians that pose risks to pedestrian safety due to their narrowness, to their presence in high-speed, high-intensity roadways, or to their surface characteristics that may present trip hazards or visual obstructions . . . ." Council Bill O-19-66 at 3–4. (*See also* Doc. 133-1 at 4–5.)

However, the City's evidence that the medians covered by Subsection (C) are "only those medians that pose risks to pedestrian safety" is again limited to general traffic safety design principles that highlight the dangers associated with standing in proximity to moving traffic. For example, Ms. Lozoya asserts that "for those medians that are designed to accommodate pedestrians, the minimum width of 6' (8' to 10' preferred) for a median refuge exists as a design guide to provide a comfortable and safer space for pedestrians and bicyclists to wait for gaps in traffic when crossing a roadway." (Doc. 77-1 at 4–5.) That general design principles suggest six feet is a more "comfortable" and safe width for pedestrian-focused medians is simply not strong enough evidence to show that the City's decision to apply the median ban to all those medians narrower than six feet was a narrowly tailored decision to advance the goal of reducing pedestrian-vehicle accidents. This is particularly true in light of the Tenth Circuit's holding in *Evans* that a prohibition on standing on medians less than half that width, while wider medians remain available, *is* narrowly tailored. *See* 2019 WL 2896507, at *7.[12]

The City certainly need not prove a certain number of pedestrian deaths or injuries on medians before it is justified in acting to address safety issues. *See Evans*, 2019 WL 2896507, at

---

[12] The Tenth Circuit appears to endorse the City's argument that landscaping presents a tripping hazard and thus a ban on standing in landscaped portions of a median is narrowly tailored, *see* Evans, 2019 WL 2896507, at *6, but as Albuquerque's Ordinance sweeps much more broadly, this element of successful narrow tailoring is negated by the lack of evidence that the six-foot threshold is narrowly tailored.

*6 (narrow tailoring "does not require the government to wait for accidents to justify safety regulations") (citation omitted). But even the City's proffered anecdotal evidence supporting the Ordinance does not directly address why banning standing in most medians less than six feet wide is a narrowly tailored restriction. (Doc. 107 at 19–20, 36.) The anecdotes generally discuss pedestrians falling or stepping off medians into traffic (*see, e.g.* Docs. 108-18 at 6, 27; 108-1 at 95:5–9), APD's safety concerns about pedestrians standing on medians (*see, e.g.*, Docs. 108-1 at 84:6–11; 108-11 at 93:6–25), and drivers causing accidents after interacting with pedestrians (*see, e.g.*, Doc. 108-18 at 9, 12, 15). They do not offer evidence, however, that Subsection (C) is narrowly tailored to address these problems. Even the few anecdotal examples of pedestrians actually being hit by vehicles while standing on medians (*see* Doc. 108-18 at 3, 18, 21–22, 24), do not discuss the width of the median, the speed limit of the adjacent street, or otherwise suggest that the accident would not have occurred if the pedestrian had been standing on a wider median.

Even if, as the City argues, Plaintiffs' Rebuttal Expert, Dr. Ragland, based his report on incomplete data and misclassified at least one accident report (*see* Doc. 125 at 9–10), his analysis of the accident data provided to him by the City still shows generally that the majority of the vehicle-pedestrian conflicts reported in Albuquerque over a four-year period would not have been prevented by the prohibitions contained in the Ordinance (*see* Docs. 89 at 30; 90-27 ¶¶ 33, 43.) Fifty percent involved pedestrians making lawful street crossings who were hit by cars (Doc. 90-27 ¶ 28), 43% involved pedestrians engaging in conduct that is already prohibited, like darting into the road (*id.* ¶ 29), and fewer than 10 reports involved pedestrian-vehicle conflicts where the pedestrian was occupying a median without violating other traffic laws (*id.* ¶ 32).

Far from demonstrating, as recommended in *McCullen*, "that it seriously undertook to address the problem with less intrusive tools readily available to it[,]" 574 U.S. 494, the City has

failed to mount an argument as to why other measures with less speech-restrictive impacts would fail to achieve the goal of reducing pedestrian-vehicle conflicts in Albuquerque. The City points to Deputy Medina's testimony that "other laws are reactive and are less able to prevent accidents as compared to the Ordinance, which is a proactive measure." (Doc. 107 at 15; *see also* Doc. 108-6 at 45:5–46:6, 77:2–18.) But this statement does not explain how a ban on standing on medians narrower than six feet would be easier to enforce than, for example, a similar ban where the threshold is three feet. And, to the extent the City argues that prohibiting pedestrians from occupying medians means they will have no opportunity to break other traffic safety laws that are harder to enforce (e.g., darting into the road), this attenuated chain of "proactive enforcement" is not enough to support such a broad restriction of First Amendment rights.

Finally, the Tenth Circuit explained in *Evans* that the parties agreed "roughly 7,000 linear feet of wide, paved medians in the City remain unaffected by the Ordinance." 2019 WL 2896507, at *7. The City has not offered any analysis here—even an estimate—of what percentage of *medians* in the City would remain available for expressive speech under the Ordinance (*see* Doc. 133), beyond an estimate of what percentage of total *roadways* would be implicated by Subsection (C) (*see* Doc. 107 at 22). Plaintiffs, on the other hand, offer evidence that the medians adjacent to all but one of the intersections that panhandlers in Albuquerque utilize most frequently would be off-limits under the Ordinance based on the 30 mph provision. (*See* Docs. 130 at 8; 132.)

It is quite possible to craft a narrowly tailored ordinance that addresses a public safety concern related to pedestrian presence on medians. Indeed, the Tenth Circuit recently held that Sandy City, Utah succeeded in doing so. *See Evans*, 2019 WL 2896507, at *7. But the City must offer evidence that proves "alternative measures that burden substantially less speech would fail

to achieve the government's interests, not simply that the chosen route is easier . . . ." *McCullen*, 573 U.S. at 495. The City failed to do so in this attempt—Subsection (C) is not narrowly tailored.

### Subsections (D) and (E) are not narrowly tailored.

Finally, the Court concludes that the City has not presented sufficient evidence that the physical exchange ban achieves the goal of reducing pedestrian-vehicle conflicts without burdening substantially more speech than necessary. Common sense dictates that there is a spectrum of dangerousness when it comes to physical exchanges between pedestrians and motorists. A motorist in the travel lane directly next to a median, sidewalk, or roadside who conducts a brief physical exchange with a pedestrian while lawfully stopped at a red light is engaging in the least dangerous conduct on this spectrum. A motorist who, several travel lanes from the median, waves money at a pedestrian and encourages him to run across travel lanes, during which time the light turns green, is on the more dangerous end of the spectrum. The Court believes that the City has ample reason to prohibit the second type of conduct in the name of safety. Yet Subsections (D) and (E) prohibit both.

The City argues that brief physical exchanges between pedestrians and drivers stopped lawfully in travel lanes at stop signs and red lights, even those on the less dangerous end of the spectrum, "encourage[] pedestrians to leave the areas that are designed for pedestrian use and to venture into areas that are not." (*See* Doc. 107 at 22.) But this preventative argument is simply not sufficient to prove that Subsections (D) and (E) will actually further the City's safety goal, particularly when they sweep so broadly in restricting speech. *See, e.g.*, *Petrello*, 2017 WL 3972477, at *20 (finding a physical exchange ban was not narrowly tailored when it applied citywide and banned exchanges that did not obstruct traffic or pose safety risks). Here, as in

*Petrello*, "there is almost no evidence in the record that roadside exchanges in the City actually obstruct traffic or endanger the public." *See id.*

The City likely could have crafted a similar but more narrowly tailored provision banning entering a travel lane for purposes of engaging in a physical exchange with a motorist. The companion subsection targeted at vehicle occupants could perhaps have prohibited obstructing the free flow of traffic for purposes of engaging in a physical exchange with a pedestrian, directly addressing some of the City's anecdotal evidence that drivers hold up traffic at green lights or cause fender benders when engaging in physical exchanges. (*See* Doc. 108-18 at 9, 12, 15.) These suggested provisions are simply musings—the Court does not endorse them here as either constitutional or narrowly tailored. However, they illustrate that other alternatives are available and the City has not explained why prohibiting *all* physical exchanges with vehicles in travel lanes is the only adequate option. The City cannot simply assert that its "chosen route" of banning all such physical exchanges is easier to enforce than banning only those physical exchanges that present a clear safety risk, as "the prime objective of the First Amendment is not efficiency." *See McCullen*, 573 U.S. at 495.

In sum, pedestrian safety is a concern and a valid government interest in Albuquerque. Pedestrians who choose to stand, seek donations, or hand out leaflets in any area where increased physical proximity to vehicles benefits their expressive activity may be taking on more risk than individuals who choose to do so from the sidewalk. Still, prohibiting all access to these spaces on the ground that Albuquerque struggles with troublingly high rates of pedestrian-vehicle conflicts, without presenting any evidence beyond anecdotal and personal speculation that the ban would *actually* reduce the number of such conflicts in the City and that less sweeping restrictions would not suffice, runs afoul of the First Amendment. The Court is not satisfied that the restrictions

contained in Subsections (B) through (E) of the Ordinance "will in fact alleviate these harms in a direct and material way" *see Doe*, 667 F.3d at 1132 (quotation omitted), and they burden a substantial amount of Plaintiffs' speech. Thus, the Court need not address whether the Ordinance leaves open sufficient alternative channels of communication.

**THEREFORE**,

**IT IS ORDERED** that Defendant's Motion for Partial Summary Judgment on the Issue of Forum Analysis (Doc. 91) is **GRANTED in part** as it relates to Subsection (A) and **DENIED** as to all other subsections of the Ordinance;

**IT IS FURTHER ORDERED** that Defendant's Motions for Partial Summary Judgment on the Issues of Content Neutrality (Doc. 93) and Significant Governmental Interest (Doc. 92) are **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 89) is **GRANTED** as to Subsections (B)–(F) and **DENIED** as to Subsection (A), and Defendant's Motion to Extend the Page Limit in its Response (Doc. 106) is granted;

**IT IS FURTHER ORDERED** that, as Plaintiffs moved for summary judgment on their First Amendment claim but failed to address or brief their remaining claims in that motion, any remaining claims for relief under 42 U.S.C. § 1983 and Article II, § 17 of the Constitution of the State of New Mexico have been waived and are hereby dismissed without prejudice;

**IT IS FURTHER ORDERED** that the Bench Trial set for August 12–13, 2019, is vacated; and Plaintiffs' Motion for Leave to Conduct Limited Additional Discovery (Doc. 134) is denied as moot.

_____
**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**